**UNITED STATES DISTRICT COURT**
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**RAYMOND F. CORMIER,**

                **Plaintiff,**

-vs-                                                                   **Case No. 6:05-cv-15-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

                **Defendant.**

_____

**ORDER**

This cause came on for consideration without oral argument on the complaint filed by Raymond F. Cormier seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for social security disability benefits. Doc. No. 1. The Commissioner answered the complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA"). Doc. No. 9. The parties consented to the exercise of jurisdiction by a United States Magistrate Judge for resolution of all further proceedings, and the case was referred to me. Doc. Nos. 12, 13.

**I.    PROCEDURAL HISTORY.**

In December 2001, Cormier filed a claim for disability benefits under the Federal Old Age, Survivors and Disability Insurance Program ("OASDI"), 42 U.S.C. § 401, *et seq.*, and under the Supplemental Security for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.*, (collectively the "Act"). R. 57-59, R. 279-80. In both applications he alleged disability beginning on September 20, 1996. His claims were denied initially and on reconsideration. R. 42-48, 50-51. Cormier timely requested a hearing before an administrative law judge ("ALJ"). R. 41.

On April 6, 2004, the ALJ held a hearing at which Cormier, who was represented by an attorney, testified. No other testimony was taken. R. 291-307.

After considering the testimony taken and the medical evidence presented, the ALJ found that Cormier met the disability insured status requirements on his alleged disability onset date and continued to be insured through December 31, 2001. R. 21. The ALJ further found that Cormier had not engaged in substantial gainful activity since the alleged onset date of his disability. *Id.*

The ALJ concluded that Cormier had a seizure disorder and coronary artery disease. R. 17. The ALJ found that these were severe impairments as defined in 20 C.F.R. § 404.1520(c), but that the impairments did not meet or equal any of the listed impairments in the Listing of Impairments. *Id.*; *see* 20 C.F.R. § 404, Subpt. P, App. 1, Table 2.

The ALJ reviewed the record evidence and concluded that while Cormier had a lengthy history of seizures, medical evidence suggested that his seizures were well controlled by medication. R. 18-19. The ALJ also noted that Cormier had gone from January 27, 2003, to March 4, 2004, without any record of seizures. R. 19.

The ALJ afforded little weight to the conclusion of Dr. Ralph Zwolinski, one of Cormier's treating physicians, that Cormier was unable to work, finding that the his reports "do not take into account that limiting hazards make work possible for those who may experience a seizure from time to time in a work setting." R. 19. The ALJ also found the conclusion inconsistent with a medical assessment by Dr. Zwolinski dated January 19, 2004, which indicated that Cormier was able to lift or carry up to fifty pounds, stand six to eight hours at a time, sit eight hours, and walk up to eight hours, with no other restrictions noted. The ALJ noted that Dr. Zwolinski wrote in this report that Cormier's seizures were under good control. *Id.*

The ALJ concluded that Cormier retained the residual functional capacity ("RFC") for medium work, with the nonexertional limitation that he avoid all work near dangerous machinery and/or unprotected heights. *Id*. The ALJ concluded that Cormier's "inability to work around unprotected heights and/or dangerous machinery does not significantly erode the occupational base" for medium work. R. 20. He did not cite to any authority supporting this conclusion in the decision, but he did refer to social security ruling 85-15 during the hearing. *Id.*, R. 293.

The ALJ concluded that Cormier could not do his past relevant work as a cook or carpet installer because that work exceeded his RFC. *Id*.

Based on these conclusions, along with Cormier's age, education, and experience, the ALJ applied the Medical-Vocational Guidelines (the "grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 1, which directed a finding of not disabled. *Id*. Based on the grids, the ALJ concluded that there were jobs, existing in significant numbers in the national economy, that Cormier could perform. *Id*. As such, the ALJ concluded that Cormier was not disabled for purposes of the Act. *Id*.

Cormier sought review of the ALJ's decision by the Appeals Council. R. 10, 52. On November 3, 2004, the Appeals Council denied the request for review. R. 6-7. Cormier timely filed his complaint in this Court following the Appeals Council's decision. Doc. No. 1.

## II. JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Cormier's application for disability benefits under OASDI and for SSI. Therefore, this Court has jurisdiction over this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

**III.     STATEMENT OF FACTS**.

*A.     Cormier's Testimony.*

Cormier was born on June 13, 1972. R. 279. He graduated from high school. R. 294. His past jobs included waiter and cook, and some carpet laying. *Id*. He lost his food services jobs because of the seizures. R. 305. He was planning on going to school in accounting. *Id*.

He stated he had no physical problems other than seizures. R. 295. The longest period he had been without a seizure was six-and-one-half months. R. 300. At the April 6, 2004, hearing, his last seizure had been on March 5, 2004. R. 296. He was taking Neurotin and Lamictal, both anti-seizure drugs prescribed for epilepsy patients.[1] R. 297. He had also taken Depakote and Keppra, also both anti-seizure drugs prescribed for epilepsy patients. *Id*. In a written report dated August 2002, Cormier indicated that medication caused his hands to shake, loss of appetite, diarrhea, and some behavioral problems. R. 74, *see also* R. 84. He also indicated that he had problems with memory, and that he could not recall events that occurred around the time of his seizures. R. 84.

---

[1] All of the information in this order explaining the type of medication prescribed for Cormier is taken from MedlinePlus, found online at http://medlineplus.gov. Unless otherwise indicated, all other medical information is taken from STEDMAN'S MEDICAL DICTIONARY (26th ed. 1995).

Cormier usually had some indication that a seizure was oncoming, but the time between this indication and the onset of the seizure varied. R. 298. He had a variety of types of seizures, including partial complex[2] and grand mal.[3] *Id*.

Cormier did not drink. *Id*. He previously smoked marijuana three or four times a day, but he had not smoked for a year before the hearing. R. 298-99. The marijuana helped him counteract the appetite suppressant effect of his medications. R. 299. After having an accident following a seizure, his driver's license was revoked. R. 297, 302.

   B.   *Medical Records*.

On July 26, 1995, Cormier was seen by Norberto Martinez, Jr., M.D., a neurologist and psychiatrist, for new onset seizures. R. 148. Cormier's girlfriend reported that there were several episodes in the previous weeks during which Cormier would stare, make oral movements as if lip smacking, stand, and move his hands. *Id*. The episodes lasted for five to ten minutes, and after thirty minutes Cormier would return to normal. *Id*. Dr. Martinez recommended an MRI of the brain and an EEG (electroencephalogram). *Id*. An EEG was conducted on July 28, 1995. R. 140. At a follow-up on July 31, Dr. Martinez concluded that Cormier had partial complex seizure disorder, likely due to previous head injuries. R. 138. Dr. Martinez prescribed Depakote. *Id*.

---

   [2] "A partial complex seizure is a brief and temporary alteration in brain function. . . . The seizure is characterized by a change in alertness or awareness, behavioral or emotional symptoms, and temporary loss of memory." Medline Plus, *Partial Complex Seizure*, http://www.nlm.nih.gov/medlineplus/ency/article/000699.htm (last visited March 14, 2006).

   [3] Also known as a tonic-clonic seizure. "[A] seizure involving the entire body, usually characterized by muscle rigidity, violent rhythmic muscle contractions, and loss of consciousness." Medline Plus, Generalized tonic-clonic seizure, http://www.nlm.nih.gov/medlineplus/ency/article/000695.htm (last visited March 14, 2006).

On August 9, 1995, Cormier told Dr. Martinez that he had had three small seizures since he last saw the doctor. Dr. Martinez increased his Depakote dose. R. 137. Cormier indicated on November 6, 1995, that he had no additional seizures since his last visit to Dr. Martinez. R. 135. However, Cormier reported a seizure on December 27, 1995 and indicated on January 17, 1996, that he had increased his dosage of Depakote because he felt that he was having more seizures. R. 134. At a follow-up examination in February, Cormier reported having had two seizures lasting less than two minutes. R. 133. Dr. Martinez advised Cormier not to drive, operate dangerous equipment, or swim alone. *Id*.

Cormier began keeping a seizure calendar. R. 132. He told Dr. Martinez in April 1996, that he had three seizures since his February examination. R. 132. In August, Cormier reported having a seizure a month. R. 131. He indicated that he had one seizure shortly before Dr. Martinez treated him on October 29, 1996. R. 130. He had three to four seizures between October 29 and his next examination by Dr. Martinez on December 17, 1996. R. 129. Two of these seizures involved urinary incontinence. *Id*.

By April 1997, Dr. Martinez noted that Cormier was having one or two partial seizures per week, but that he would sometimes go two to three weeks without any episodes. Dr. Martinez opined that Cormier's seizures appeared to be well controlled. R. 127. On June 12, 1997, Cormier indicated that he had had about one seizure a month since April. While he was generally tolerating his medicine, after one episode, Cormier became violent, and Dr. Martinez believed medication may have played a role in that outburst. R. 126. In October, Cormier reported that he had approximately one mild seizure every two to three weeks. Dr. Martinez noted that Cormier was

taking Phenobarbital, a drug used to control seizures and help with anxiety and aggression, in addition to his other medications. R. 125.

In January, 1998, Cormier was involved in an automobile accident as an unrestrained passenger. R. 124. This resulted in head trauma and some partial seizures. *Id*.

Cormier was seen intermittently at Bert Fish Medical Center between June 1998 and October 2001. R. 214-28. Cormier also was treated for seizures at the Volusia Public Health Clinic from May 2000 through January 2002. R. 121-22. In September 1998, he indicated that he had had several seizures in the previous week. R. 224. On July 3, 2000, records reflect that he had been having seizures for three hours. He was directed to go to an emergency room. R. 217. On October 24, 2000, he indicated that he had had three seizures the previous Sunday. R. 216.

In October 2001, Cormier was seen at Halifax Medical Center Emergency Room where he reported having had several seizures in a day. He was also having difficulty holding down his seizure medicine. R. 174.[4] He was also diagnosed with gastroenteritis (inflammation of the stomach and intestine). *Id*.

Later in October 2001, Cormier began seeing Ralph Zwolinski, M.D. Dr. Zwolinski noted that Cormier had been referred by the Epilepsy Foundation, that he had had seizures as frequently as two to four times a day, followed by weeks without seizures. R. 186. Dr. Zwolinski's neurological examination was normal, and he observed no problems with gait, reflexes, or motor strength. R. 187. An MRI taken on November 19, 2001, at Dr. Zwolinski's request was normal, R. 165, but an EEG was abnormal, R. 167. Dr. Zwolinski's assessment was that Cormier had a

---

[4] The medical record indicates that the patient is a 79-year old male. R. 174. This is likely a typographical error.

complex partial seizure disorder. R. 187. On November 16, 2001, Dr. Zwolinski indicated that Cormier could not work due to "Intractable Epilepsy." R. 185.

During an examination on November 26, 2001, Cormier reported that he had had only one seizure since his last visit. R. 184.

Cormier reported having recurrent generalized seizures during the holidays in 2001. He indicated that since he began taking Keppra he had not had any seizures. R. 183. At a follow-up examination in February, 2002, Cormier noted that he had had four complex partial seizures in approximately one month's time. Dr. Zwolinski increased the dosage of Keppra. R. 182.

In May 2002, Cormier told Dr. Zwolinski that he had had seven complex partial seizures in April. R. 246. Dr. Zwolinski indicated that Cormier would benefit the most from a Vagus Nerve Stimulator implant, but that "unfortunately we have not been able to get that approved at this time." R. 246. Dr. Zwolinski opined that "in my opinion, [Cormier] would meet the criteria for disability because of his seizures, which I am rarely of the opinion regarding patients with epilepsy. Unless he is able to get the Vagus Nerve Stimulator, the chances of him ever regaining gainful employment will be very minimal." *Id*.

In August, 2002, Dr. Zwolinski wrote that since Cormier started taking Lamictal, his complex partial seizures had been reduced to two a day. R. 245. In October 2002, Cormier indicated that he had three partial complex seizures that month. R. 244.

On November 26, 2002, Cormier underwent a cardiac catheterization. The conclusions included coronary artery disease. R. 231-32.

On January 27, 2003, Cormier reported that he had had six seizures since his last examination by Dr. Zwolinski, including three seizures in one day. R. 241. By April 28, 2003,

Cormier reported having no seizures since his last examination, and that he was and responding well to Lamictal. R. 238. At follow-ups in July and October, 2003, Cormier again reported having had no seizures. R. 235-37.

On December 5, 2003, Dr. Zwolinski prepared a Medical Assessment of Ability to Do Work Related Activities. R. 233-34. He concluded that Cormier could sit for eight hours at time, could stand for eight hours with ten minute breaks every hour, and could carry up to twenty-five pounds. He could not lift any weight due to seizures. R. 233. Dr. Zwolinski indicated that Cormier could not tolerate extreme temperature changes. R. 234. The form did not address whether Cormier could work around hazards. Dr. Zwolinski's conclusion was that Cormier had an "uncontrollable seizure disorder and has seizures daily at . . . different times. These are unpredictable and are disabling. Prognosis for seizures are poor." *Id*.

On January 19, 2004, Dr. Zwolinski completed another assessment form. In it, he opined that Cormier could sit for eight hours, stand from six to eight hours, and walk up to eight hours a day. He could lift and carry up to fifty pounds occasionally. He should avoid extreme hot or cold temperatures. This form also did not address whether Cormier could work around hazards. Dr. Zwolinski's conclusion was that Cormier could "have seizures at anytime but he is currently under good control." R. 276.

The next record of Cormier's treatment by Dr. Zwolinski is dated April 23, 2004. At that time, Cormier reported having had a tonic clonic (grand mal) seizure on March 5, 2004. He had another partial complex seizure on April 17, 2004. Dr. Zwolinski increased the dosage of Lamictal. Dr. Zwolinski again opined that Cormier was "unable to work because he has intractable seizures with breakthrough and this condition will not change in his lifetime." R. 274.

Cormier was treated at Bert Fish Medical Center on May 30, 2004, for a complex partial seizure. He reported having had his last seizure two weeks earlier. R. 277.

C. *Reviewing Professionals' Opinions.*

On April 9, 2002, Eric C. Puestow, M.D., completed an RFC assessment based on review of Cormier's records. Dr. Puestow opined that Cormier's only limitations were that he must never climb ladders, ropes and scaffolds, and that he must avoid concentrated exposure to hazards. R. 188-95. Another reviewing physician, whose name is eligible, reached the same conclusion in October 2002. R. 206-13.

**IV. STANDARD OF REVIEW.**

To be entitled to Social Security disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C). The Act provides further that a claimant is not disabled if he is capable of performing his previous work, or, if "considering his age, education, and work experience, [he could] engage in any other kind of substantial gainful employ which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to

disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

This Court's review of a final decision by the SSA is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987)(quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence even if the proof preponderates against it. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

V.     ANALYSIS.

Cormier contends that the ALJ erred by relying on the grids rather than calling a vocational expert to determine whether there were jobs available in the economy that he could perform. He also asserts that the ALJ did not give proper consideration to the opinion of his treating physician. In the alternative, Cormier contends that the ALJ erred by failing to consider a closed period of disability. I will only address the alleged error at step-five of the sequential evaluation process, because I find it to be dispositive.

"Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the [Commissioner] to show other work the claimant can do. . . . Although this burden can sometimes be met through straightforward application of [the grids] . . . [e]xclusive reliance on the grids is appropriate in cases involving only exertional impairments . . . [and is] inappropriate when a claimant has a nonexertional impairment that significantly limits the claimant's basic work activities." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (internal citations omitted). In the present case, the ALJ determined that Cormier's seizure disorder resulted in a nonexertional impairment that precluded him from working around hazards.

"[W]hen both exertional and nonexertional limitations affect a claimant's ability to work, the ALJ should make a specific finding as to whether the nonexertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations." *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985). In this circuit, "[a]n ALJ's conclusion that a claimant's limitations do not significantly compromise his basic work skills or are not severe enough to preclude him from performing a wide range of [work at the

designated level] is not supported by substantial evidence unless there is testimony from a vocational expert." *Marbury v. Sullivan*, 957 F.2d 837 839 (11th Cir. 1992); *see also Williams v. Halter*, 135 F. Supp. 2d 1225, 1239 (M.D. Fla. 2001) (holding that it was error to exclusively rely on the grids when a claimant had seizure disorder that precluded him from "whole categories of jobs . . . that require[] him to be exposed to heights or dangerous machinery").

Here, the ALJ concluded that Cormier's "inability to work around unprotected heights and/or dangerous machinery does not significantly erode the occupational base." R. 20. He did not support this conclusion by the testimony of a vocational expert. Indeed, he did not cite any evidence in the record or legal authority in his decision supporting this conclusion.[5] Because substantial evidence did not support his conclusion, it was, therefore, error for him to rely on the grids to determine that Cormier was not disabled. *See Marbury*, 957 F.2d at 839.

Cormier requests that the Court order the Commissioner to pay him benefits rather than remanding the case for further proceedings. A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Because the Commissioner has not properly assessed whether there is work available in the national economy that Cormier could perform in light of his nonexertional limitations, the record

---

[5] The ALJ's reference during the hearing to social security ruling 85-15 is insufficient, under the holding in *Marbury*, to sustain the ALJ's conclusion that Cormier's nonexertional limitations did not significantly erode the occupation base for work at the medium exertional level.

does not establish disability without any doubt.  Therefore, remand for further proceedings is required.

**VI.    CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings under sentence four of 42 U.S.C. § 405(g).  The Clerk of Court is directed to issue a judgment reversing the decision of the Commissioner of Social Security and remanding the case for further proceedings and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 14, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

Unrepresented Parties